NO. 12-04-00344-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS

SHANNON CONKLIN AND
TEXAS DEPARTMENT OF 
PUBLIC SAFETY,                                             §     APPEAL FROM THE 145TH
APPELLANTS

V.                                                                         §     JUDICIAL DISTRICT COURT OF


JANICE GARRETT,                                          §     NACOGDOCHES COUNTY, TEXAS 
APPELLEE




OPINION
            Shannon Conklin and the Texas Department of Public Safety (“DPS”) (collectively
“Appellants”) appeal the trial court’s order denying their motion for summary judgment in favor of
Janice Garrett.


 Appellants raise one issue on appeal. We affirm.

Background
            On August 16, 2002, at approximately 2:00 p.m., DPS Officer Conklin initiated a traffic stop
of a maroon GMC pickup truck on northbound U.S. Highway 59. The DPS videotape showed that
Conklin approached the driver of the vehicle, Mike Arthur Jones, asked him for his driver’s license,
and requested that he step to the rear of the vehicle. During the ensuing conversation, Jones
explained to Conklin that he was traveling from Houston, Texas to Shreveport, Louisiana to visit his
mother. After explaining to Jones that he had stopped him for speeding, Conklin, noting to himself
that Jones appeared nervous, requested a background check using the radio in his patrol car. While
he waited for the background check to be performed, Conklin proceeded to issue Jones a written
warning for the speeding offense. Conklin returned to his patrol car, where the dispatch officer
reported to him that Jones had twelve prior felony convictions. Conklin reemerged from the car,
asked Jones if he was carrying any illegal contraband, and requested from Jones permission to search
his vehicle. Jones gave Conklin permission to search his vehicle. Conklin then performed a pat-down search on Jones for weapons, during which he confirmed that Jones had his keys in the front
pocket of his pants. Conklin, however, did not remove the keys from Jones’s pants pocket. 
            Conklin proceeded to search Jones’s truck. During his search of the front and rear seating
areas, Conklin remarked that he smelled both burnt and green marijuana. Jones shifted about
nervously and informed Conklin that he needed to use the restroom. Conklin instructed Jones to
remain at the rear of the truck and continued his search. After searching for approximately four
minutes, Conklin withdrew from the vehicle with his gun drawn and ordered Jones to lie on the
ground. Jones complied, but insisted repeatedly that he had done nothing wrong. Conklin responded
that he could smell marijuana in the vehicle.


 Conklin straddled Jones and attempted to handcuff
him. Jones, persisting that he had done nothing wrong, began to raise up, at which point Conklin
struck Jones in the back of his head with his fist. Conklin continued in vain his attempt to handcuff
Jones, who had, by then, turned over on his back. Conklin backed away and attempted to spray
Jones with O.C. spray. Jones raised his hand and blocked the O.C. spray, while continuing his
assertions that he had done exactly as Conklin had instructed. 
            Conklin returned to the passenger compartment of his patrol vehicle to call for backup,
leaving Jones unrestrained. While Conklin was in the patrol car, Jones leisurely walked to his
vehicle, entered through the front passenger door, and drove off at a high rate of speed. Conklin
attempted to stop Jones before he drove away, but could not reach him before the vehicle was
underway. As he ran along side the truck, Conklin drew his gun and shot twice at Jones’s front tire
as another vehicle was passing Jones in the left lane.
            Conklin rushed to the driver’s side of his patrol car, but then ran back around the front of the
vehicle to the passenger side to retrieve his clipboard from the hood. Conklin returned to the driver’s
seat of the patrol car and began to pursue Jones, who was by this time nowhere in sight. Conklin
took the next exit off Highway 59 and made a fortuitous right turn on Industrial Boulevard. Jones
was still nowhere in sight. Conklin accelerated along Industrial Boulevard but had not regained
visual contact with Jones by the time he reached the intersection of Industrial Boulevard and North
Street.


 At the intersection, Conklin shouted to another motorist to roll down his window and asked
if he had seen which way the maroon pickup truck had turned. The motorist, who had apparently
seen Jones, directed Conklin to the right, which was southbound on North Street.
            Conklin accelerated southward on North Street at a high rate of speed. Prior to reaching
North Loop 224, Conklin activated the siren on his patrol vehicle.


 Soon thereafter, Conklin
regained visual contact with Jones’s vehicle, which was traveling in the right lane behind another
vehicle. As Conklin closed the distance between his vehicle and Jones’s, Jones drove his truck into
the left lane and accelerated. Conklin accelerated as well and continued in his pursuit of Jones. 
Jones disregarded stop lights and intersections, often driving down the center turn lane on North
Street at high rates of speed. Conklin continued after Jones, also driving in the center turn lane and
even driving briefly in the adjacent northbound lane. By this time, other law enforcement officers
began to block many of the cross streets along North Street. However, no other officers joined
Conklin in his high speed


 pursuit of Jones. As the pursuit continued, Jones and Conklin passed in
close proximity to more than two hundred other motorists, more than eighty retail businesses, and
Stephen F. Austin University. The chase abruptly ended at the intersection of North Street and State
Highway 21


 when Jones’s vehicle collided with the vehicle being driven by Garrett. Jones was
subsequently apprehended after attempting to dispose of a portion of the large quantity of marijuana
concealed in his truck.
            Garrett sued Appellants under the Texas Tort Claims Act alleging negligence on Conklin’s
part. Appellants filed a motion for summary judgment supported solely by Conklin’s affidavit and
alleged that Conklin was entitled to official immunity. Garrett filed a response supported by
deposition testimony from members of three separate branches of law enforcement as well as
Conklin’s counseling record made after the police pursuit at issue. The trial court ultimately denied
Appellants’ motion, and this appeal followed.

Official Immunity for Police Chase
            In their sole issue, Appellants argue that the trial court erred in denying their motion for
summary judgment because they presented a prima facie showing of the element of good faith, which
they contend Garrett failed to controvert.
Standard of Review
            In reviewing a 166a(c) motion for summary judgment, this court must apply the standards
established in Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548–49 (Tex. 1985), which are as
follows:
1.The movant for summary judgment has the burden of showing that there is no genuine issue
of material fact and that it is entitled to judgment as a matter of law;
 
2.In deciding whether there is a disputed material fact issue precluding summary judgment,
evidence favorable to the nonmovant will be taken as true; and
 
3.Every reasonable inference must be indulged in favor of the nonmovant and any doubts
resolved in its favor.
 
See id. at 548–49. For a party to prevail on a motion for summary judgment, he must conclusively
establish the absence of any genuine question of material fact and that he is entitled to judgment as
a matter of law. Tex. R. Civ. P. 166a(c). A movant must either negate at least one essential element
of the nonmovant's cause of action or prove all essential elements of an affirmative defense. See
Randall's Food Markets, Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex.1995); see also MMP, Ltd.
v. Jones, 710 S.W.2d 59, 60 (Tex.1986). Since the burden of proof is on the movant, and all doubts
about the existence of a genuine issue of a material fact are resolved against the movant, we must
view the evidence and its reasonable inferences in the light most favorable to the nonmovant. See
Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex.1965). 
We are not required to ascertain the credibility of affiants or to determine the weight of evidence in
the affidavits, depositions, exhibits, and other summary judgment proof. See Gulbenkian v. Penn,
252 S.W.2d 929, 932 (Tex. 1952). The only question is whether or not an issue of material fact is
presented. See Tex. R. Civ. P. 166a(c).
            Once the movant has established a right to summary judgment, the nonmovant has the burden
to respond to the motion for summary judgment and present to the trial court any issues that would
preclude summary judgment. See, e.g., City of Houston v. Clear Creek Basin Authority, 589
S.W.2d 671, 678-79 (Tex.1979). All theories in support of or in opposition to a motion for summary
judgment must be presented in writing to the trial court. See Tex. R. Civ. P. 166a(c).
Governing Law
            A political subdivision of the State is not liable for the acts or conduct of its officers or
employees unless its immunity is waived by the Texas Tort Claims Act. See City of Lancaster v.
Chambers, 883 S.W.2d 650, 658 (Tex. 1994). The Texas Tort Claims Act provides that sovereign
immunity is waived when a governmental unit would, were it a private person, be liable to a claimant
under Texas law for personal injury caused by a condition or use of tangible personal or real
property. See Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2) (Vernon 2005). 
            Official immunity is a common-law defense available to governmental officials and
employees sued in their individual capacity. Kassen v. Hatley, 887 S.W.2d 4, 8 (Tex. 1994). 
Official immunity only shields a defendant from liability; it does not make a defendant immune from
suit. Eastland Cty. Coop. Dispatch v. Poyner, 64 S.W.3d 182, 192 (Tex. App.–Eastland 2001, pet.
denied). The elements of the defense of official immunity are as follows:
 
              1.           The defendant was a government official or employee;
 
              2.           The defendant was sued for performing a discretionary governmental act;
 
              3.           The defendant performed the act in good faith;
 
              4.           The performance of the act was within the scope of the defendant’s authority; and
 
              5.           The defendant was sued in his individual capacity.
 
See Harless v. Niles, 100 S.W.3d 390, 395–96 (Tex. App.–San Antonio 2002, no pet.). 
            Courts measure good faith in official immunity cases against a standard of “objective legal
reasonableness” without regard to the official’s subjective state of mind. Wadeqitz v. Montgomery,
951 S.W.2d 464, 466 (Tex. 1997). Under this standard, an official acts in good faith if a reasonably
prudent official under the same or similar circumstances could have believed that the official action
was justified based on the information he possessed when the conduct occurred. Joe v. Two Thirty
Nine Jt.V., 145 S.W.3d 150, 164 (Tex. 2004). In police pursuit and emergency response cases, the
Texas Supreme Court requires a balancing test to determine whether an officer has acted in good
faith under the objective legal reasonableness standard. Chambers, 883 S.W.2d at 656. In such
cases, the defendant must establish that a reasonably prudent officer under the same or similar
circumstances could have believed that the need to immediately apprehend the suspect outweighed
a clear risk of harm to the public in continuing the pursuit. Id.; see also, e.g., Wadewitz, 951 S.W.2d
at 466; University of Houston v. Clark, 38 S.W.3d 578, 582–84 (Tex. 2000). 
Summary Judgment Evidence
            The specific facts related to what occurred during the traffic stop and ensuing high speed
pursuit are essentially undisputed because the dashboard camera footage from Conklin’s vehicle was
part of the summary judgment record. Thus, we turn our attention to the evidence related to the issue
of whether Conklin conducted the pursuit in good faith.
            Appellants’ motion for summary judgment was supported solely by Conklin’s affidavit. In
his affidavit, in addition to recounting the underlying details of the traffic stop and pursuit of Jones,
Conklin stated, in pertinent part, as follows:
 
 Under the circumstances as I then perceived them, I believed, and based upon my education, training
and experience, I can state that another reasonably prudent peace officer would also have believed that
the suspect was an extremely dangerous individual that posed a significant risk of harm to the public
and that he needed to be immediately apprehended. The suspect was a convicted felon, on parole,



and was in possession of what I believed to be a quantity of marihuana sufficient to give probable
cause for a felony arrest. In addition, the suspect committed the criminal offenses of resisting arrest,
assaulting a peace officer and fleeing apprehension.


 I exercised my discretion in utilizing my firearm
in an attempt to disable the right passenger tire of the suspect’s vehicle and thus prevent him from
using the vehicle as a means of escape and restricting him to a rural area and preventing him from
disposing of the marijuana before he could be apprehended. I was also aware that the suspect could
utilize his vehicle as a deadly weapon during his attempt to avoid apprehension. Further, I had not
ascertained whether or not the suspect was in possession of deadly weapons inside the vehicle.




              ....
 
I believe, and a reasonably prudent trooper could have believed, that I drove with regard for the safety
of all others.

              ....
 
The decision to make the initial traffic stop and the manner in which I conducted the traffic stop, as
well as my decision to search the suspect vehicle and arrest the suspect for felony possession of
marihuana, were matters within my discretion as a peace officer. Further, the decision to pursue the
fleeing felony suspect and the manner in which I pursued the suspect’s vehicle were all matters that
required me to utilize my discretion in the course and scope of my employment with the DPS. Further,
based upon my education, training and experience, I can state that I acted in “good faith” in the
manner in which I conducted the traffic stop, arrest and pursuit. I believed, and another reasonably
prudent peace officer could have believed, that it was reasonable to pursue a convicted felon, on
parole, that was in possession of a felony quantity of marihuana, had assaulted a peace officer while
resisting arrest, was fleeing apprehension and endangering the public in the manner in which he was
operating his vehicle. I believed, and another reasonably prudent peace officer could have believed
that the need to immediately apprehend the suspect outweighed the risk of harm to the public of the
pursuit. The suspect would have had the opportunity to dispose of the marihuana if he was not
immediately apprehended. In addition, the suspect[’]s actions at the time I attempted to arrest him
indicated that he would pose a serious risk to any other peace officer that came into contact with him
and could likewise pose a danger to the public by attempting to carjack a member of the public in his
attempt to flee. Further, I had not determined whether or not the suspect had concealed weapons in
his vehicle before his escape. In addition, I kept the public safety in mind during all phases of the
pursuit. I attempted to drive my own vehicle in a manner that lessened the likelihood of myself being
involved in an accident. In addition, I was aware that other peace officers were attempting to close
off major intersections along the route of the pursuit in order to protect the public.
 
            In support of her response, Garrett attached a copy of Conklin’s DPS counseling record dated
September 4, 2002. Conklin’s counseling record states, in pertinent part, as follows:

            DEFICIENCIES INDICATING NEED FOR COUNSELING:
 
1.Trooper Conklin during a pursuit passed several vehicles in the center turn lane. At one point
he drove approximately ½ mile in the center turn lane in an area with a high concentration
of both vehicular and pedestrian traffic. This was an unneccesary [sic] risk to both him and
others. This created an unsafe condition.
 
District Policy #16 Pursuit driving should always be governed by common sense. Department Drivers
have a duty to drive with due regard for the safety of all persons. 

              ....
 
2.Trooper Conklin discharged his weapon in an effort to disable the vehicle of a fleeing
suspect. Trooper Conklin did this at a time when it was unsafe for passing motorists. There
was a civilian vehicle on the other side of the suspect vehicle that could have been struck by
a stray round.
 
            Garrett’s response was further supported by the deposition testimony of David Adams, a
constable in Nacogdoches County. Constable Adams testified that he was also traveling northbound
on North Street at the time of the Jones pursuit. Adams further testified that he did not “proceed to
go 90 miles an hour as well” because it was “useless for [him] to go that fast ... considering the
amount of traffic on the road” and that it would have been “dangerous also.” Adams further testified
that North Street is the “main drag” in Nacogdoches and that traffic was “medium to heavy” at the
time of the Jones pursuit.
            Further still, Garrett’s response was supported by the deposition testimony of Sheriff Thomas
Kerss. Kerss also confirmed that North Street is the main north/south street in Nacogdoches. Kerss
testified that driving down the road at ninety miles per hour is not a particularly safe thing to do. 
Kerss further testified that the sheriff’s office’s policy with regard to high speed chases is that each
pursuit has to be governed by the officer’s common sense and good judgment given the
circumstances. Kerss agreed that traveling at ninety miles per hour in a heavily-traveled pedestrian
area posed a high risk of danger to the public and stated that, based on the circumstances in the
instant case as they were represented to him,


 Conklin probably should have disengaged or, at least,
backed off on his speed and tried to use his radio to call in assistance to keep track of the suspect
vehicle. Kerss elaborated, 
 
[D]ue to the heavily populated area that [Conklin] was going into, the time of the day, that [the pursuit]
was occurring, the likelihood ... for a negative encounter in putting our general public at risk is [going
to be] somewhat increased, and 90 miles an hour is a tremendous speed to be traveling down that
heavily populated area.

              ....
 
I can’t think of anywhere in Nacogdoches that has as many cross intersections .... [and] [o]f course,
you’ve got all those kids.

Kerss further stated that he would not have authorized any of his officers to participate in the pursuit
at that time. However, Kerss testified that he would have permitted their participation had the
pursuit continued back into the countryside, at which point he would have authorized his officers to
get in front of Jones’s vehicle to deploy spike strips or to block traffic at upcoming intersections.
            Garrett’s response was also supported by the deposition testimony of Nacogdoches Police
Chief William Lujan. Lujan testified that chasing a suspect through downtown running through stop
lights creates a dangerous situation because it could lead to innocent loss of life. Lujan further
testified that he was not aware that any of his officers, at the time in question, were proceeding
southbound on North Street at a high rate of speed with their sirens and beacon lights engaged. 
Lujan also stated that he was not aware of any facts that would make it legitimate for his officers to
have been traveling at a high rate of speed headed southbound on North Street.
Risk of Harm to the Public in Continuing Pursuit versus the Need to Apprehend Immediately
            On appeal, Appellants argue that Garrett, in order to defeat Conklin’s assertions of good
faith, was required to provide evidence that no reasonable person in Conklin’s position, given the
facts of the case, would have continued the pursuit. See Clark, 38 S.W.3d at 581 Moreover,
Appellants argue that Garrett’s summary judgment evidence fails to address the “need” prong of the
balancing test. However, Garrett responds that Appellants failed to demonstrate that they were
entitled to judgment as a matter of law because Conklin, in his affidavit, failed to demonstrate that
the necessity to apprehend immediately was weighed against the risk to the public. Because
Appellants had the burden to prove that they were entitled to judgment as a matter of law, see Tex.
R. Civ. P. 166a(c), we will first address Garrett’s assertion that Appellants failed to meet their burden
with regard to the “good faith” element.
            A conclusory statement that a reasonable officer could or could not have taken some action
will neither establish good faith on summary judgment nor raise a fact issue to defeat summary
judgment. Clark, 38 S.W.3d at 581 (citing Wadewitz, 951 S.W.2d at 467). Instead, testimony on
good faith must discuss what a reasonable officer could have believed under the circumstances and
must be substantiated with facts showing that the officer assessed both the need to apprehend the
suspect and the risk of harm to the public. Id.
            The risk element of good faith refers to “the countervailing public safety concerns,” or “the
nature and severity of harm that the officer’s actions could cause (including injuries to bystanders
as well as the possibility that an accident would prevent the officer from reaching the scene of the
emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear
to a reasonably prudent officer. Id.
            Here, while Conklin’s affidavit offers some discussion as to what facts show that he assessed
the need to apprehend Jones immediately and the risks Jones posed to the public, there is no
discussion of facts showing that he assessed the risk of harm to the public in his continuing his
pursuit of Jones. Conklin states, “I kept the public safety in mind during all phases of the pursuit. 
I attempted to drive my own vehicle in a manner that lessened the likelihood of myself being
involved in an accident.” This general reference to his mindfulness of public safety and his
statement that he drove to lessen the likelihood that he himself would be involved in an accident
does not meet the requirement under the rule espoused in Wadewitz and Clark. Such blanket
statements must be substantiated with facts showing that the officer assessed both the need to
apprehend the suspect and the risk of harm to the public. Id. We conclude that Appellants failed
to demonstrate that they were entitled to judgment as a matter of law. Thus, we hold that the trial
court did not err in denying their motion for summary judgment. Appellants’ sole issue is overruled.

Disposition
            Having overruled Appellants’ sole issue, we affirm the trial court’s order denying
Appellants’ motion for summary judgment.

                                                                                                     JAMES T. WORTHEN 
                                                                                                                 Chief Justice


Opinion delivered October 31, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.







(PUBLISH)